IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,

                                    CR Action
            Plaintiff,              No. 1:21-447


        vs.                         Washington, DC
                                    December 6, 2021
JOSHUA CHRISTOPHER DOOLIN,
                                    1:08 p.m.
            Defendant.


        TRANSCRIPT OF VIDEO HEARING ON CONDITIONS
        BEFORE THE HONORABLE CARL J. NICHOLS
            UNITED STATES DISTRICT JUDGE


APPEARANCES:

**For the Plaintiff:**       BENET KEARNEY
                             DOJ-USAO
                             One Saint Andrew's Plaza
                             New York, NY 10007
                             212-637-2260

                             MATTHEW MEODER
                             DOJ-USAO
                             400 E. 9th Street, Suite 5510
                             Kansas City, MO 64106
                             816-426-3122

**For the Defendant:**       ALLEN H. ORENBERG
                             THE ORENBERG LAW FIRM, P.C.
                             12505 Park Potomac Ave., 6th Floor
                             Potomac, MD 20854
                             301-984-8005


**Reported By:**             **LORRAINE T. HERMAN, RPR, CRC**
                             Official Court Reporter
                             U.S. District & Bankruptcy Courts
                             333 Constitution Avenue, NW
                             Room 6720
                             Washington, DC 20001
                             202-354-3196

1          **P R O C E E D I N G S**

2          **COURTROOM DEPUTY:**  Good afternoon, Your Honor.

3    This is criminal case year 2021-447, United States of

4    America versus Joshua Christopher Doolin, defendant number

5    3.  Pretrial officer is Christine Schuck.

6          Counsel, please identify yourselves beginning with

7    the government.

8          **MR. MOEDER:**  Good afternoon, Your Honor.  Matthew

9    Meoder and Benet Kearney for the United States, Your Honor.

10         **THE COURT:**  Counsel.

11         **MR. ORENBERG:**  Good afternoon, Your Honor.  Allen

12   Orenberg on behalf of Mr. Doolin.

13         **THE COURT:**  Mr. Orenberg.

14         Ms. Schuck, I see you are on as well.  Welcome.

15         Mr. Orenberg, does your client consent to proceed

16   with this hearing by video?

17         **MR. ORENBERG:**  Yes, he does, Your Honor.

18         **THE COURT:**  I've reviewed the pretrial report that

19   warranted this hearing.  Why don't we begin with you,

20   Mr. Meoder.  Are you going to take the lead for the

21   government?

22         **MR. MOEDER:**  Yes, Your Honor.

23         **THE COURT:**  What is your understanding of the

24   circumstances of the execution of a warrant by the FBI and

25   the finding of this weapon?

1          **MR. MOEDER:**  Yeah.  Absolutely, Your Honor.

2          Your Honor, just for the record, the government

3     has turned over to Mr. Orenberg several reports from the FBI

4     that the government received this weekend and this morning,

5     as well as some administrative documents relating to the

6     execution of the search warrant, as well as approximately --

7     around 80 photographs.

8          The understanding of the government, generally

9     speaking -- this matter is still, I would say, fluid and

10    there are still investigative steps that are being taken by

11    the FBI -- the government's general understanding of the

12    matter is that on November 30th of 2021, a Magistrate Judge

13    in the Middle District of Florida issued a warrant for

14    Mr. Doolin's address/residence that was located at 834

15    Tavares Road in Polk City, Florida.  That search warrant was

16    executed December 2nd, 2021, at approximately 7:00 in the

17    morning.

18         At that time, the FBI approached this residence.

19    And for the Court, the setup of the residence is a

20    single-wide trailer/modular home; two bedroom, one bath.

21    And one of those bedrooms is a master and one of those

22    appears to be a spare bedroom.

23         Officers initially made contact with Mr. Doolin

24    and his wife, Morgan Doolin.  The initial encounter with

25    Mr. Doolin, the agents described him as aggressive during

1    the initial encounter, somewhat belligerent, accusing,

2    making accusations at them, yelling at them so much that

3    they had to pull out their weapons and point them at

4    Mr. Doolin.  He eventually calmed down and the officers were

5    able to talk to him and explain their presence.

6            After that time, officers cleared this trailer

7    home.  And then at that point in time, the officers joined

8    Mr. Doolin and Ms. Doolin in the residence where they talked

9    briefly.  At that time, Mr. Doolin and Ms. Doolin exited the

10   residence and the search took place.

11           Between 7:15 in the morning and approximately 9:15

12   in the morning, that's when the search took place.  There

13   were several items that were found of evidentiary value, the

14   first being the AR-15 rifle, which is an M&P Smith & Wesson

15   rifle.  It was located in the spare bedroom.  It was in a

16   box that appeared to be the manufacturer's box.  Inside that

17   box was a -- headphones, appeared to be hearing protectors,

18   as well as eyeglasses or eye protectors.  Also in the box

19   there was an empty magazine and a glove.

20           The box was underneath a bed in the spare bedroom.

21   Around that box was some camouflage clothing, a gun cleaning

22   kit and then approximately 50 to 100 individual rounds of

23   .22 caliber ammunition.  It should be noted that that

24   ammunition was not associated with that firearm and could

25   not be -- according to the agents, could not be fired out of

1    that firearm.  So just to make that note.  On top of the bed

2    there was -- it appeared to be male and female clothing.

3    And it was somewhat of an -- in a disorganized fashion.

4         In the closet that's in the hallway, I believe, of

5    this residence, that's where the officers found the other

6    items that were located and that were mentioned by the

7    pretrial officer, including the airsoft gun, the paintball

8    gun and then the two -- I don't know -- tactical vests.  One

9    was camouflage in nature and one was white.

10        After those items were located and the search was

11   completed, officers made contact with Mr. and Mrs. Doolin

12   outside of the residence.  At that time they went through a

13   return.  The return was the one that was filed with the

14   Middle District of Florida.

15        And the agent who is the case agent on this case

16   went through the items that were recovered from the search

17   warrant execution.  Among those items are the items that I

18   mentioned, as well as two Apple iPhones, a laptop, some

19   clothing that agents believed was associated with Mr. Doolin

20   that he wore on January 6th of 2021 in D.C.

21        When the officers were going through this return,

22   they were reading off every single entry point.  And when

23   the officers got to the Smith & Wesson rifle, Mr. Doolin --

24   and I am paraphrasing here but according to the agents he

25   said, What is that?

1          Then the agent responded and said, You can't have

2     that.  And then there were some other comments that were

3     made about some of the other items, including an airsoft

4     pistol, and the white body armor, um, the -- what they

5     described as a camo plate carrier or that tactical vest that

6     I mentioned and the blue paintball gun.

7          Mr. Doolin expressed to the agent that he didn't

8     know why they were being confiscated and that they were not

9     associated with the crime that he is charged with.

10          Ms. Doolin at that time said the firearm, the

11     rifle, belonged to her father; and that she received it from

12     her father; and that the tactical -- camouflage, tactical

13     vest was also -- belonged to her father.  I think that there

14     was further communication with Mr. Doolin and the agents

15     after the search warrant execution, when the agent was

16     returning the cell phones to Mr. Doolin, where he said that

17     -- to the effect that he did not know of the presence of the

18     firearm and it belonged to his wife.

19          On the firearm box, Your Honor, is a receipt which

20     appears to be from the firearm purchase; that was from

21     November of 2020.  At this time the government, through the

22     FBI, is looking at a trace of the weapon; and that is

23     expected to take three to four days.  Unfortunately, I do

24     not have the results of that trace at this time, Your Honor.

25          **THE COURT:**  So the government's view, I take it,

1      as communicated through Ms. Lesley, is that at least the

2      evidence as you just summarized it, Mr. Meoder, would be

3      sufficient or would warrant Mr. Doolin's detention or is the

4      government's view that I should wait to see what happens

5      with the trace or something else?

6           **MR. MOEDER:**  Judge, we believe that Mr. Doolin had

7      knowledge of this, given the proximity of the firearm in his

8      living location; that it's a very small residence that it

9      was in.  One of the two bedrooms -- it was underneath the

10     bed; however, there were clothing that were identified as

11     male clothing in that room, as well as some -- a jacket that

12     resembled the jacket that he wore on January 6th of 2021 on

13     top of that.

14          The standard, Your Honor, according to 18 U.S.C.

15     3148 is clear and convincing evidence.  Based on this

16     violation, we do not believe at this time that the

17     possession of the firearm in and of itself constitute a

18     federal, state or local offense.

19          If the government becomes aware of an offense that

20     this potentially violated, we will notify the Court and then

21     the standard changes to probable cause.  But I would say

22     that that is somewhat fluid at the moment.  We do not

23     believe it is in violation of federal law or state law, but

24     we are not sure if there is any local, municipality

25     ordinances that would prohibit a gun if you are facing

1   misdemeanor charges.

2           So I think that at this point in time we do

3   believe there is evidence -- now I did mention to the Court

4   that we are still exploring this.  I think the gun trace

5   will be probative on this matter.  And there's a couple

6   additional questions that the government still has regarding

7   this.  But because the gun was found in his house, the house

8   is very small, his property, or presumably his property was

9   found in the spare bedroom, that we think that there was

10  understanding and knowledge that the gun was there.

11          **THE COURT:**  But also that that warrants, in your

12  view, pretrial detention rather than something else?

13          **MR. MOEDER:**  Judge, I believe there is a violation

14  that took place.  And the pretrial service's recommendation

15  is that he is no longer a candidate for supervision, and

16  that his bond should be revoked.  So the government's going

17  to support that recommendation from pretrial.

18          **THE COURT:**  Thank you, Mr. Meoder.

19          Mr. Orenberg, what is Mr. Doolin's view on this?

20          **MR. ORENBERG:**  Well, Your Honor, obviously

21  Mr. Doolin's view or initial view on this is that his

22  conditions of release should not be revoked at this time.

23  Wherever we come out of this hearing today or perhaps on a

24  continued hearing, as the government alluded to for the

25  first time that I've heard that there is an ongoing

1    investigation regarding the trace of the weapon and all of

2    that, I believe that there are conditions or a combination

3    of conditions that can assure this Court, not only of my

4    client's appearance in court as necessary or required, but

5    to assure the safety of the community.

6           As the Court heard from Mr. Meoder, and as I have

7    reviewed in the documents that were provided to me late last

8    evening and some documents this morning, the various reports

9    and so forth, my client was genuinely surprised when he

10   first heard of the rifle being recovered from his bedroom.

11   And his wife, Morgan Doolin, later -- or I'm not sure if it

12   was later or before that point in time.  She was interviewed

13   also, Your Honor.  And she indicated to the agent who was

14   interviewing her that the rifle either belonged to her

15   father and her father gave it to her and it was put

16   underneath the bed, but that her husband, Joshua, was not

17   aware of the presence of the rifle.

18          Now, Mr. Meoder is saying -- I think what he is

19   saying is -- two reasons, just because male clothing was

20   found in that spare bedroom on top of the bed, under which

21   the rifle was found, and the fact that they live in a double

22   -- he called it a double-wide trailer with two bedrooms and

23   a bathroom.  I don't know exactly how big the premises or

24   the residence is, but he is saying just because it's that

25   type of residence, and the fact that some male clothing was

1    found on top of the bed should lead this Court to conclude

2    that he had knowledge that the weapon was indeed under the

3    bed.

4         I want to clarify something else.  I think the

5    government is asking for revocation or pretrial detention at

6    this point in time based on the seizure of the AR-15 only.

7    There has been some discussion about recovery of other

8    items, particularly two vests.

9         As I understand it, one of the vests that was

10   recovered is actually my client's protective vest that was

11   either issued to him or bought by him in connection with his

12   previous work.  He has been suspended from his job because

13   of the arrest in this January 6th case.  He was a paramedic

14   with a local firefighting department, and he would use this

15   -- it's a very light type of protective vest that he would

16   wear when he was working.  The other vest you heard that was

17   recovered is attributable to Mrs. Doolin's father.

18        There's also, the government mentioned, an airsoft

19   pistol.  I don't recall clearly if he mentioned the

20   paintball pistol, but apparently there is a paintball gun

21   that was recovered also.  To my understanding, I am not

22   intimately familiar with airsoft pistols, but it's a form of

23   recreation that people can go to specified gaming areas or

24   ranges where people actually shoot these very soft pellets

25   at each other.  Paintball, I'm a little more familiar with.

1    Again, it's a game where people go to a particular range or

2    outdoor area where they engage in an activity where they

3    shoot these paintballs at each other.  In any event, these

4    are not traditional firearms, I would say, for the purposes

5    of which we are here today.

6         There was also some mention of some ammunition,

7    which I just heard about in the last hour or so, 50 to 100

8    rounds of .22 caliber ammunition.  Mr. Meoder I think

9    properly pointed out it has no connection to the AR-15 that

10   was found under the bed.

11        I would note, though, in the receipt for property

12   that was provided to me by the government, that there is no

13   mention under the description of items of the .22 caliber

14   information.  The only mention that I see of it -- and I

15   stand to be corrected -- is in two documents, handwritten

16   notes and now some typed up notes, which I think were

17   prepared by the Assistant U.S. Attorneys in this case.  In

18   the actual receipt for property, which was provided to me,

19   there is no mention of seized .22 caliber ammunition.

20        Your Honor, my client -- I want to go back to the

21   beginning of the encounter with the execution of the search

22   warrant.  The officers came to my client's home early in the

23   morning.  My client had some genuine concerns initially.

24   Why was the police or why were the FBI agents coming to his

25   home that early?  He was, as he has related to me, he was

1    not confrontational.  He was irritated because he didn't

2    understand fully the nature and the reasons why they were

3    coming to his home so early in the morning.  He was asking

4    some questions.  But once that it was explained to him why

5    they were there and that they had a lawful search warrant,

6    that he immediately became cooperative and he was very

7    cooperative during the next two hours.

8         I don't think it should be held against him or

9    against anyone when a group of FBI agents or police officers

10   come to our home so early in the morning and demand entry

11   into your home and you don't understand why.

12        He, as I said, was cooperative and communicative

13   with the officers throughout the entire proceedings.  He

14   also expressed -- and I mentioned this in the beginning --

15   genuine surprise when it was pointed out to him that the

16   AR-15 was found in his home.

17        Mr. Doolin obviously is very aware of his

18   conditions of his release that were issued -- well,

19   initially by the Middle District of Florida, but by

20   Magistrate Judge Harvey, back on July 9th of this year.

21        As the Court is well aware, we have been through a

22   couple, shall I say, bond review motions and hearings in

23   this case.  And he is very familiar with the conditions of

24   release and when he can do and cannot do.

25        You know, the question that keeps popping up in my

1    mind about all of this is why would he risk -- why would he
2    risk his freedom, his liberty?  It's not that he is unaware
3    of his -- shall we say the protections or restrictions on
4    what he can or cannot do, including do not possess a
5    firearm, destructive device or other weapon.

6         Why would he risk so much at this point in his
7    life?  He is facing two misdemeanors.  They are Class A
8    misdemeanors.  He is a young man.  As I mentioned, previous
9    to his being arrested in this case, he was serving as an EMT
10   with the local fire department.  He was suspended from that
11   job.  And since that time, as the Court may recall, he has
12   found other suitable employment.  Employment with some
13   interesting hours.  He's a delivery person for a bread truck
14   company.  He gets up very early in the morning.  He drives
15   all around the region delivering bread.  He is being very
16   industrious, very responsible, to himself and to his wife.
17   To his wife, Morgan.

18        They got married civilly about six months ago.
19   His wife is in school.  As I understand it it's some medical
20   tech kind of training.  He is supporting her.  He is
21   supporting the two of them together.  Why would he risk --
22   why would he risk so much at this point having an AR-15 in
23   his house?  It just doesn't make sense.

24        Also, I should point out to the Court that he and
25   Morgan are having a -- as I understand it, a religious

1    wedding and a party to celebrate their marriage on January

2    4th, and they've invited over 100 people to this party.

3    They have already paid or at least put deposits down for

4    catering, invitations, flowers, all of that.  Why would he

5    risk so much at this point in time?  He's fully aware of his

6    obligations under the order setting conditions of release.

7            I had -- in reviewing the reports that were

8    provided to me, it comes out right away that he was

9    surprised; and that Morgan, his wife, is taking full

10   responsibility for the presence of that rifle in the home.

11           Now maybe, perhaps, misguided on her part.  Maybe

12   she doesn't understand the conditions of release, but that's

13   not her primary responsibility.  The primary responsibility

14   does lie with my client.  But, unfortunately, he did not

15   control this part of his life.  What his wife was doing or

16   may have been doing without his knowledge.

17           Your Honor, Mrs. Doolin would like to address the

18   Court on this point and then afterwards Mr. Doolin would

19   also like to address the Court.

20           **THE COURT:**  Yes, that seems fine.  Ms. Doolin.

21           **MS. DOOLIN:**  Good afternoon, Your Honor.  My name

22   is Morgan Doolin.  I wanted to explain the situation about

23   my rifle that was found.  It was purchased last year on

24   Black Friday by my father.  He gave it for me for Christmas.

25           I am going up to visit them in two weeks in North

1   Carolina, and I wanted to bring it back up there and return

2   it to him when I go to visit.  So I had brought it home.  I

3   hid it underneath the spare bedroom, a room where Josh never

4   goes.  It's my laundry room.  So that's why there's both

5   male and female clothing in there.  That's my laundry room.

6   I hid it in the original box that it was purchased in.

7   There is no ammo for it in the house at all.

8          And I was under the impression that if Josh had

9   know idea that it was there, and there was no ammo for it,

10  that it wouldn't cause an issue or be anything to disrupt

11  his conditions of release.  I would have never had it there

12  in the first place had I known that.  Absolutely not.  So

13  that's why I had hidden it in a place where he never goes.

14  And I didn't think that it would interfere at all with his

15  conditions of release if he had not been aware that it was

16  there.

17          **THE COURT:**  Thank you.  Mr. Doolin?

18          **THE DEFENDANT:**  Good afternoon, Your Honor.

19          As my lawyer was saying, I genuinely had no idea

20  that rifle was in the house or on the property.  I mean,

21  I've got everything to lose and nothing to gain by having an

22  unloaded rifle tucked away in the spare bedroom of my house.

23          I thought, if I was going to have a weapon, it

24  would be for self-defense purposes to protect my house.  And

25  an unloaded rifle tucked away in the spare bedroom with no

1  ammo on the premises would gain me nothing.  And I have

2  everything to lose.

3          Also, it wasn't -- I know I'm on pretrial

4  detention.  I know pretrial can come over at any time.  They

5  can come and look in my house.  It wouldn't be a shock that

6  somebody would come and check my house.  So I wouldn't be

7  belligerent enough to have a weapon on the premises.

8          I mean, I feel like I really bent over backwards

9  to follow my conditions of release to a T.  I am the sole

10 provider of my house.  I am taking care of my wife while she

11 finishes up clinicals.  I am trying to get this cleared up

12 so I can take care of my family and then go back to being a

13 firefighter at the fire department.  That's really my two

14 main goals, is take care of my family and be a firefighter

15 again.  I would never risk all of that over having an

16 unloaded AR-15 tucked away somewhere in my house.  I just

17 have nothing to gain from that.

18         I would also like to point out to the matter, at

19 one point my ankle monitor even -- the charger for it that I

20 was given malfunctioned.  And in the middle of the night my

21 charger wasn't charging and was going to die.  I went out of

22 my way in the middle of the night, even though it wasn't

23 something that was my fault.  I didn't have any control over

24 it.  I was given a faulty piece of equipment.  I drove in

25 the middle of the night.  I went and got another charger

1    from another party and I charged my monitor.  And I

2    continued to do that for several days until the weekend was

3    over I could go to Tampa and get a new charger.

4            I have done everything I can.  I haven't been,

5    like, that's not my problem; that's something they need to

6    deal with.  I tried very hard to follow the conditions to a

7    T.  I am in no way trying to be sneaky or sly.

8            In the same degree, I mean, I have been expecting

9    a visit from the FBI to a degree because I've been advised

10   that they were visiting different workplaces, which is what

11   they did prior to what they kind of came and went through

12   the -- all of our houses the first time.  So it wasn't like,

13   Oh, surprise.  I didn't expect them to come that morning,

14   but I was expecting a visit eventually for them to come in

15   the middle of the day sometime and execute a search warrant.

16           Because I know they haven't been to this resident

17   yet.  The first one they executed was a property that I was

18   no longer living at.  So, I mean, it wasn't like -- I would

19   literally have to be -- I mean, I know they are coming.

20   They are going to be here eventually to execute a search

21   warrant for my house, of course.  I wouldn't be foolish

22   enough to have a weapon on the property.

23           That being said, as far as -- it was mentioned

24   that I was belligerent somehow the morning they came.  Your

25   Honor, I thought I was extremely calm.  I got woke up.  I

put my pants on.  Got dressed.  I went outside.  I asked
what was going on.  There were rifles pointed in my
direction.  I was extremely calm the whole time.  I asked if
they could stop pointing the rifles at me.  Other than that
I was not screaming and yelling.  I had a mild tone the
whole time.

They showed me the search warrant.  They were
asking where my wife was very loudly.  I told them, she is
in the house getting dressed.  They said, She has already
had five minutes.  I replied to them, Can your wife get
dressed in five minutes?  Because mine can't.  Just being
honest.  Ladies take a little longer than us to get ready.
I guess maybe he didn't appreciate that.  I am just
explaining.  She is getting ready.  She will be out in a
moment.  You woke us up.  It's early in the morning.  And I
work -- my schedule I work is -- I go in at midnight.  So I
am a night shift person.  I sleep from 7, 8:00 in the
morning.  I sleep all day.  So I was probably just getting
to sleep by the time they came.  I tried to be very --
anything they asked me, I tried to be helpful and
cooperative the whole time.  When they initially picked me
up at the fire department, I literally said, Good morning,
Officers.  Anything they asked me.  I unlocked my phone the
first time, just like I did this time.  We both unlocked our
phones, gave it to them, asked them to return them in a

1    timely manner.

2          I've done everything I can to try to get this

3    situation resolved and get back to work and provide for my

4    family and go back to being a firefighter when this is all

5    taking care of.  I am not trying to make any enemies.  I am

6    not trying to do anything stupid to this point.  I feel like

7    everything -- I mean, I personally had my own firearms.  Why

8    would I have some stock AR-15 in a box shoved under the bed?

9    I made sure my weapons I owned were off the premises and

10   weren't anywhere in my possession.

11         I mean, I've tried very hard.  And I don't want

12   this to be something that, you know, effects the life I am

13   trying to live right now.  It's already kind of heavily

14   restricted life to what I was originally living.  I mean, I

15   genuinely did not know that weapon was in the house.

16         As far as I was concerned, I was following my

17   conditions of release to a T.  I continually check up with

18   pretrial anything I'm asked.  If I get Face Timed in the

19   middle of the night, I am not rude.  I'm not like, Why are

20   you calling me?  I'm, like, Hey, what can I do for you?

21         Like the other night something was going on with

22   the home base and she said it was making a weird monitoring

23   thing, the night after they came.  I'm like, no problem.  I

24   Face Timed them.  Here it is.  It is where it should be.

25   And went back to bed.

1          I've tried to be respectful and do everything I

2    was supposed to up to this point, Your Honor.  I genuinely

3    have everything to lose and nothing to gain by having

4    something like that in my house.

5          Thank you, Your Honor.

6          **THE COURT:**  Thank you, Mr. Doolin.

7          Mr. Orenberg, anything you would like to add to

8    what Mr. and Mrs. Doolin just mentioned?

9          **MR. ORENBERG:**  Well, Your Honor, I don't want to

10   be redundant, but it seems to me that the Court needs to

11   carefully consider what has been presented, not only by

12   myself and Mr. Doolin and Mrs. Doolin but by the government,

13   Mr. Meoder.

14         There were some acknowledgments made that morning

15   by Mrs. Doolin.  She claimed ownership of the gun.  She

16   indicated that her husband didn't know about the gun.  And,

17   most importantly, my client seemed genuinely surprised.  He

18   was genuinely surprised that this weapon was even there.  I

19   am focusing on the AR-15 because I believe that's the focal

20   point of this discussion.

21         The other items, the other alleged contraband that

22   was seized, you know, sure, it adds some background to

23   everything going on here, but it's not really the focus of

24   what I think the Court should be focusing on right now.

25         In fact, it's possible that down the road, if we

1    get to a different place in this case, that all of what

2    happened on December 2nd may be subject to a pretrial motion

3    to suppress evidence.  But we are not at that juncture right

4    now, and I've discussed that with my client, of course.

5              But I think that the Court needs to take into

6    account that we do have reports from the agents that were

7    there that morning that confirm at least -- it's not shown

8    by clear and convincing evidence that the government has

9    proven that my client has knowledge that the weapon was

10   there under the bed in the spare bedroom.

11             **THE COURT:**  Thank you, Mr. Orenberg.

12             Ms. Schuck, it seems to me there are two pieces of

13   information that I am still interested in knowing.  The

14   first is -- and this is not to say I am not crediting

15   everything that I heard from the Doolins, but it would be

16   important for me to know, Mr. Meoder, what the results of

17   the -- basically the background on the gun are.  You know,

18   whether it, in fact, was purchased by Ms. Doolin's father.

19   That, obviously, would be corroboration of her story.  And

20   if not, then that would be important for me to know.  That's

21   the first thing.

22             And this is really, perhaps a question for

23   Ms. Schuck, although it's also a question for you,

24   Mr. Orenberg, I suppose, which is that there are certainly

25   some cases in which I have a defendant who is, of course,

1    not allowed to possess weapons pretrial.  And it's very

2    clear from PSA's perspective what happened with the

3    defendant's weapons.  In other words, the defendant says,

4    Yeah, I had four firearms and I gave them to my brother for

5    safe keeping.

6            Sometimes that information is contained in a PSA

7    report about compliance with conditions.  Ms. Schuck, do you

8    have information -- Mr. Doolin obviously just discussed the

9    firearms that he owns.  But do you have information,

10   Ms. Schuck, about what Mr. Doolin did with the firearms that

11   he owned that he mentioned earlier?

12           **PROBATION:**  Good afternoon, Your Honor.  Christine

13   Schuck, Pretrial Services.

14           At this time, I cannot make representations

15   regarding how Mr. Doolin's firearms were removed, were they

16   transferred, et cetera.  I can try -- the Middle District of

17   Florida was not available to be on this -- available for

18   this hearing.  I am trying to communicate with them right

19   now to see if I can get that information.

20           **THE COURT:**  Here's what I'd --

21           **PROBATION:**  I will --

22           **THE COURT:**  Sorry.  Go ahead.

23           **PROBATION:**  I'm sorry, Your Honor.

24           **THE COURT:**  Go ahead.

25           **PROBATION:**  I will note for the Court, Your

1    Honor -- just bear with me.  I'm trying to reach the Middle

2    District.

3              **THE COURT:**  I don't think -- I just wanted to know

4    what you knew at this time.  Here's --

5              **PROBATION:**  At this time -- so I will note for the

6    Court this, in regards to the firearms conditions,

7    Mr. Doolin acknowledged that he understood the conditions of

8    release, which included no firearms and that he could not

9    have any firearms, destructive device or other weapon.  That

10   is a national standard condition; and that is imposed for

11   the officers' safety.  Because when we request courtesy

12   supervision in other jurisdictions, they conduct home

13   visits, which is also a national standard.  So for officers'

14   safety, that condition is put in place.

15             The fact that there was an AR-15 rifle in the

16   residence puts the officers of the Middle District of

17   Florida at risk.  If anything went wrong, those officers are

18   at risk when they are conducting a home assessment.

19             So because of that, we are requesting that he be

20   removed from all supervision programs.  And the Middle

21   District of Florida does concur with our recommendation.

22             **THE COURT:**  Yes.

23             Believe me, I appreciate all of that.  What I am

24   trying to understand is, to paraphrase, I think it's fair to

25   say Mr. Doolin has essentially said, Look, I own some guns

1   myself.  To be compliant with my terms of pretrial release,

2   I am not in possession of them.  Here's what I did with

3   them.  And if pretrial had knowledge of that or I suppose,

4   Mr. Orenberg, if we developed that a little bit more and

5   that is, in fact, the case or perhaps the Middle District of

6   Florida knows about that, then that would be consistent with

7   the notion that he knew about those weapons, of course, and

8   he did something with them, and it would be very anomalous

9   and inconsistent for him to not have done the same with this

10  particular weapon.

11          I don't think any of that takes away from the

12  argument you are making, Ms. Schuck.  But it is at least

13  important for me to know, one, Who really bought the gun and

14  is there -- what's the government's evidence on this going

15  to look like?  And then, two, What is known or what could be

16  known about what Mr. Doolin previously did with his own

17  weapons?  My guess is, if anyone in the government knows

18  anything about that, it would be the Middle District of

19  Florida.

20          I don't want to just open this up --

21          **PROBATION:**  I actually just received information

22  from the Middle District of Florida.  They just informed me

23  that the FBI told them that he took them into custody.  I

24  apologize.  What they are telling me is that he took them

25  into custody; that the FBI took them into custody.

1        **THE COURT:**  I think they are misunderstanding the

2    question, because I think that is probably the answer to

3    what did the FBI do with the weapons that they encountered

4    on December 2nd.

5        I am asking the question of back in July, when

6    Mr. Doolin was placed on pretrial release with conditions,

7    what did he do then with the weapons that he owned at the

8    time and whether the Middle District of Florida has any

9    knowledge about that?

10       Look, I don't want to do this on the fly.  So

11   here's what I would like to do, I would like to essentially

12   take this matter under advisement.  I would like to conduct

13   another hearing as soon as possible when we have two pieces

14   of information.  And it may be that the second piece of

15   information I am talking about just needs to be developed by

16   Mr. Orenberg and Mr. Doolin, which is fine, or perhaps it's

17   already in the possession, so to speak, of the Middle

18   District of Florida.

19       The first piece of information is, What does the

20   government's tracing of the weapon surface by way of who

21   bought it?  When?  And then the second would be, What did

22   Mr. Doolin do in -- I'll assume it's July of 2021, when he

23   was placed under pretrial conditions, what did he do with

24   the weapons that he owns, he acknowledged he knew about it

25   and owned, and did pretrial know anything about it?

1    I'd like to know the answers to those two

2    questions, and to have a hearing as soon as we have the

3    information.  It may be that one piece of information is

4    obviously the government's tracing of the weapon at issue

5    here.  And the other may be developed only by you,

6    Mr. Orenberg, because it may be that pretrial doesn't know

7    this information already.  Sometimes they do and sometimes

8    they don't is my experience.  What I want to do is have a

9    hearing as soon as we have those two pieces of information.

10    I suspect the latter will be developed very

11    quickly by you, Mr. Orenberg.  It may also be developed by

12    the Middle District of Florida with Ms. Schuck.  The former,

13    Mr. Meoder, may take a little bit of time.  Those facts are

14    relevant to me in considering this question.

15    I'm not taking any action right now, but I am

16    going to take it under advisement.  Is that sufficiently

17    clear to everyone?  In other words, I want to conduct a

18    hearing, and it can be by video or phone, as soon as we know

19    the results of the government's -- I forget the technical

20    term for it -- the tracing of the purchasing history of the

21    weapon; that's the first information.  The second is

22    information regarding what Mr. Doolin did with any other

23    weapons that he owned back in July or whenever he first went

24    into compliance with the pretrial conditions.  Okay?

25    Is that sufficiently clear, Mr. Meoder?

1          **MR. MEODER:**  Yes.  Yes, that is completely clear,

2    Your Honor.  Thank you.

3          And we will notify Mr. Orenberg and the Court as

4    soon as we have that information.  It was told to us by the

5    agents that it could be a couple of days, but we will follow

6    up with them.  Thank you.

7          **THE COURT:**  What I would like you to do, as soon

8    as you have that information, please communicate it to

9    Mr. Orenberg and Ms. Lesley, because then I would like to do

10   a hearing, basically, as soon as we can can after that.

11         Mr. Orenberg, do you have it?  Are we clear?

12         **MR. ORENBERG:**  Yes, Your Honor.  I understand.  We

13   will communicate to the Court through Ms. Lesley when we are

14   ready to schedule a hearing.

15         **THE COURT:**  Thank you.  And then we will get it on

16   the calendar as soon as possible thereafter.  I am taking

17   this under advisement pending the additional information to

18   be forthcoming.

19         Thank you, Counsel.

20         **MR. ORENBERG:**  Thank you, Your Honor.  May we be

21   excused?

22         **THE COURT:**  Yes.

23         **MR. ORENBERG:**  Thank you.

24         (Proceedings concluded at 1:48 p.m.)

25

1          **C E R T I F I C A T E**

2

3              I, **Lorraine T. Herman, Official Court**

4    **Reporter,** certify that the foregoing is a true and correct

5    transcript of the record of proceedings in the

6    above-entitled matter.

7

8              **Please Note:**  This hearing occurred during

9    the COVID-19 pandemic and is therefore subject to the

10   technological limitations of court reporting remotely.

11

12

13

14   ___December 10, 2021___              ___/s/ Lorraine T. Herman___
              **DATE**                        **Lorraine T. Herman**

15

16

17

18

19

20

21

22

23

24

25