UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | CASE NO: 1:21-cr-0447-1 (CJN) |
| | * | |
| **JONATHAN POLLOCK,** | * | |
| **Defendant** | * | |

********

## JONATHAN POLLOCK'S MOTION TO TRANSFER VENUE

Jonathan Pollock, by his undersigned counsel, hereby respectfully moves this Honorable Court for a transfer of venue to afford him a fair trial judged by an impartial jury who do not feel personally aggrieved and do not harbor significant prejudice against persons who participated in the political demonstrations on January 6, 2021. The motion is filed to preserve the rights guaranteed to him by the Fifth and Sixth Amendments to the United States Constitution and pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure.

**I.      The Law**

A criminal trial ordinarily should take place in the district where the offense was committed. U.S. Const. amend. VI.

> England, from whom the Western World has largely taken its concepts of individual liberty and of the dignity and worth of every man, has bequeathed to us safeguards for their preservation, the most priceless of which is that of trial by jury. This right has become as much American as it was once the most English. . . . In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. 'A fair trial in a fair tribunal is a basic requirement of due process.' In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as

> 'indifferent as he stands unsworn.' His verdict must be based upon the evidence developed at the trial. This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies. It was so written into our law as early as 1807 by Chief Justice Marshall in 1 Burr's Trial 416(1807). 'The theory of the law is that a juror who has formed an opinion cannot be impartial.'

*Irvin v. Dowd*, 366 U.S. 717, 721-22 (1961) (internal citations omitted).

While jurors need not be "totally ignorant of the facts and issues involved," trial by jurors "having a fixed, preconceived opinion of the accused's guilt would be a denial of due process." *Irvin v. Dowd*, 366 U.S. at 724. Moreover, the American justice system "has always endeavored to prevent even the probability of unfairness." *In re Murchison*, 349 U.S. 133, 136 (1955) (Black, J.).

If extraordinary local prejudice will prevent the defendant from obtaining a fair trial in the district of the offense, then due process requires transferring the trial to another appropriate alternative venue. *Skilling v. United States*, 130 S. Ct. 2896 (2010). For these situations, the Federal Rules of Criminal Procedure provide a mechanism to enable a defendant to seek a change of venue if (a) the atmosphere is so prejudicial the defendant cannot obtain a fair and impartial trial within the district in which the action is brought or (b) for the convenience of the parties and witnesses, if in the interest of justice.[1] The purpose of the rule is to secure a fair trial to the defendant when circumstances in the district where the action is brought would place an undue risk of unfairness upon the defendant if tried within that district. *Sheppard v. Maxwell*, 384 U.S. 333 (1965).

---

[1] "Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. Proc. 21(a).

Factors to be considered in whether to grant a change of venue based upon prejudicial pretrial publicity are the size and characteristics of the community, the nature and extent of pretrial publicity, the proximity between the publicity and the trial, and evidence of juror partiality. *United States v. Skilling*, 561 U.S. 358, 378-381 (2010). In some cases, a potential jury pool can be determined to be irredeemably biased when the alleged crime results in "effects . . . on [a] community [that] are so profound and pervasive that no detailed discussion of the [pretrial publicity and juror partiality] evidence is necessary." *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996) (summarily finding that a trial of Oklahoma City bombing suspects in federal court in Oklahoma City would be constitutionally unfair).

## II.     Factual Background

What jury selection in January 6 cases has shown is that too many in the DC jury pool have "a fixed, preconceived opinion" that January 6 defendants are guilty.

> In a poll of D.C. residents conducted by the federal public defender's office cited by Webster, 71 percent said that from what they had heard, those arrested for involvement in the Capitol riot were guilty of the charges brought against them.
> . . .
> Another [juror] said she felt unsafe during the Trump presidency as a Black woman.
> . . .
> I don't have a high opinion of former president Donald Trump, and by extension, I don't think his supporters are particularly smart for supporting him," the third said.[2]

Jury questionnaires reviewed by undersigned counsel have shown that a majority of the members of the jury pool have expressed bias against January 6 defendants including often describing

---

[2] *D.C. Circuit considers claim of Jan. 6 jury bias ahead of Trump trial* (Wash Post 2/6/24) at https://tinyurl.com/4emwt5d5

them as "traitors" "bigots" "white supremacists" among other negative opinions.[3]  In counsel's experience, DC juries express much less bias even in cases where murder, violent gang racketeering conspiracies and members of foreign drug cartels are charged.

Many jurors have also expressed that they were personally impacted by the January 6 events. The Washington Post is replete with stories of DC residents expressing continued fear and resentment.

> What hasn't disappeared for residents and workers in the Capitol Hill neighborhood are the memories of that dark day when democracy felt in the balance. As the anniversary of the attack approaches, the fallout continues to be felt. For the rest of the country, the Capitol attack was a national political crisis.
>
> For those living and working on Capitol Hill, it was also deeply personal. The Capitol lawn was their backyard. They walked their dogs on the same blocks, shopped at Eastern Market, bought Christmas trees from the local Boy Scout troop, drank beers together at the Hawk 'n' Dove and wolfed down breakfast at Jimmy T's. The mob that invaded the Capitol — breaking windows, vandalizing offices, destroying statues and viciously attacking and injuring 140 U.S. Capitol and District police officers — had also invaded their lives."[4]

DC Jurors more than most Americans continue to be bombarded with news about January 6 in the "local" paper, the Washington Post and local stations such as WUSA-9, which cover every verdict and sentence imposed in January 6 cases.  Most jurors have followed Congressional hearings and other media attention.  Indeed, in the 2020 presidential election more than 90% of DC residents voted for President Biden and against then-President Trump.

---

[3]  These opinions were expressed by jurors in cases in which undersigned counsel was involved including 21-cr-28; 21-cr-631; and 21-cr-175.

[4] *As Jan. 6 anniversary approaches, fear, disbelief and anger still felt in Capitol Hill neighborhood,* (Wash Post, Jan. 4, 2022) at  https://tinyurl.com/2e7vzz8z

Empirical evidence also shows that only a handful of the hundreds of January 6 defendants have been acquitted by DC juries. This applies even to cases involving non-violent misdemeanor offenses. Indeed, more January 6 defendants have been acquitted in bench trials than by DC juries, which is a complete skewing of ordinary judge-jury determinations.[5]

While courts have qualified jurors in this district this has generally only been possible by 'rehabilitating' jurors who have expressed inability to be fair but upon further questioning by the Court have assented to the notion that they will follow the Court's instructions.

### III. Continued Prejudicial Pretrial Publicity

The renewed intense media attention on January 6 has resurfaced as the presidential election nears. Indeed, former Chief Judge Thomas Hogan during a presentation at Georgetown University recently opined that the selection of an impartial jury in January 6 cases has become more difficult because of the number of cases that are continuing to be tried and because we are now in the political season.

As well, Special Counsel Smith has filed a lengthy memorandum describing in detail the charges that he has filed against former President Trump.

> A nearly 200-page special counsel filing of facts and legal argument on why Donald Trump can be criminally prosecuted for his efforts to overturn the results of the 2020 election landed Thursday in D.C. federal court, triggering a process that could end in the public seeing significant new details of the case before the November election.
>
> The massive brief on special counsel Jack Smith's case against the former president — which could run up to 180 pages, plus more in exhibits — was filed under seal, per the court's order, a spokesman for Smith's office said. It will remain that way until U.S. District

---

[5] Even in bench trials the number of acquittals is minimal and much less than the number of acquittals in non-January 6 cases.

>Judge Tanya S. Chutkan decides what she wants to do with a redacted version, which prosecutors also planned to file under seal with the expectation that it will later be released publicly.[6]

### A.     Proximity of Prejudicial Publicity to Trial

In *Skilling v United States*, 561 U.S. 358 (2010), the Supreme Court recognized the significance of prejudicial pretrial publicity that occurs in close proximity to the trial. *Skilling*, 561 U.S. at 383. *Skilling* distinguished *Rideau v. Louisiana*, 373 U.S. 723, 727 (1963) where the Court reversed a conviction based on prejudicial pretrial publicity from the situation in *Skilling* because by the time the trial took place four year later "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Skilling,* 130 S. Ct. at 2902.  Here, the continuing pretrial publicity as well as the Trump presidential campaign and his prosecution in this district will have a pronounced effect in close proximity to the October 15 trial.  The close proximity of the prejudicial publicity must be attributed at least in part to the government's decision to proceed with the prosecution against former President Trump during the election cycle.

The ongoing negative publicity creates presumed prejudice for defendants. In fact, Mr. Pollock respectfully submits that requiring him to go to trial in the District in the shadow of the Special Counsel prosecution during this election cycle would be highly prejudicial.  The First Circuit, for example, addressed the prejudicial effect of an analogous situation – contemporaneous congressional hearings in *Delaney v. United States*, 199 F.2d 107 (1st Cir. 1952).  In *Delaney*, the trial judge refused to grant a lengthy defense continuance request, which was based upon ongoing congressional hearings into the "scandal" involving the defendant. *Id*. at 114. The First Circuit ruled

---

[6] *Jack Smith lays out Jan. 6 case against Trump. Will filing be public?*  (Wash Post, 9/26/24) at https://tinyurl.com/2hh8cv2d

that the trial judge abused his discretion in not granting the continuance, noting that the actions of Congress in generating adverse publicity were equivalent to prosecutors doing the same:

> [B]eing brought to trial in the hostile atmosphere engendered by all this pre-trial publicity, would obviously be as great, whether such publicity were generated by the prosecuting officials or by a congressional committee hearing. In either case he would be put under a heavy handicap in establishing his innocence at the impending trial. Hence, so far as our present problem is concerned, we perceive no difference between prejudicial publicity instigated by the United States through its executive arm and prejudicial publicity instigated by the United States through its legislative arm.

*Id*.

The DC Circuit addressed a similar issue during the Watergate investigation. Former Nixon official Robert Ehrlichman sought a continuance of his trial date based upon the Senate Watergate hearings, which was denied by the trial judge. Upholding the trial court's ruling, the Court of Appeals distinguished *Delaney* on the grounds that the Ehrlichman was a full year in the rear-view mirror:

> Similarly, a continuance in the circumstances at bar is not required by *Delaney v. United* States, 199 F.2d 107 (1st Cir. 1952), where legislative hearings were held concerning the criminal activity to be tried. In this case, unlike *Delaney*, the Senate Watergate hearings occurred almost a year before the trial commenced and the defendants were not under indictment at the time of the hearings.

*United States v. Ehrlichman*, 546 F.2d 910, 916, n. 8 (D.C. Cir. 1976).

Here, the non-stop prejudicial publicity requires the Court to transfer venue to a federal district that is not as impacted by the negative prejudicial effect. The instant case is far worse than *Delaney* and *Ehrlichman*. The TV Show Sixty Minutes just last week had

segment on the events of January 6, with not a single opinion from a defense counsel or other person who could refute the arguments that those involved were guilty of an unprecedented attack on democracy.

## Conclusion

Accordingly, for the reasons stated above, a transfer of venue outside of the District of Columbia is necessary to afford Mr. Pollock a fair trial as guaranteed to him by the Due Process clause and the Fifth and Sixth Amendment to the United States Constitution.

Respectfully submitted,

/s/
_____

**Carmen D. Hernandez**
Bar No. MD03366
7166 Mink Hollow Road
Highland, MD 20777
(240) 472-3391

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served via ECF on all counsel of record this 1st day of October, 2024.

/s/ *Carmen D. Hernandez*
**Carmen D. Hernandez**